The next argued case is number 19, 1590, Kimble v. United States. Mrs. Fromme.  Mrs. Kimble presents four issues on appeal, whether the willfulness penalty was properly imposed, whether the maximum penalty was warranted in this case, whether the regulations mandate a maximum penalty of $100,000, and whether the penalty runs afoul of the Eighth Amendment. In this argument, I will concentrate upon the issues of excessiveness of the penalty and willfulness, but will, of course, answer any questions the court has about the other issues that are presented. What is left in this case after the Norman decision? Well, what's left in the case after the Norman decision is the factual issues that apply to Kimble but did not apply to Norman. What factual issues are you referring to? First of all, in fact, in the argument in the Norman case, there was a question from the court about the issue of whether, if you find willfulness, it is proper to impose a 50% penalty across the board, and at what time that 50% penalty would be not justified. This case is one where I think we can talk about whether, if you find that there was willfulness, a 50% penalty was the proper penalty. Mrs. Kimble did present that very issue to the court below, and it was discussed. There's no dispute in this case. There were two accounts. The Swiss account, which was Mrs. Kimble's father's account, was established by Mrs. Kimble's father as a failsafe against another Holocaust. Mr. Kimble's father was very concerned, having lost a good deal of his family in the Holocaust. His parents had escaped from Poland just prior to the Holocaust, and he was concerned that it would happen again and that there would be basically running money for the family. So he deposited in that account his earnings after taxes were paid, and he kept the account secret. He asked Mrs. Kimble to keep the account secret. He asked her husband to keep the account secret, and the account was, in fact, kept secret. Nothing went in from Mrs. Kimble. Nothing came out. Then there was another account, the HSBC account, which was in Paris. That account was an account used by the Kimbles extensively. There was nothing secret about it. They deposited money in it. They took money out of it, and they used it, and neither of the accounts was disclosed until Mrs. Kimble read, after her father's death, after her mother's death, she read in the newspaper that there was an issue with foreign accounts, and as soon as she read that, she voluntarily went to the IRS and disclosed the existence of these accounts. I think the fact that neither of the accounts was disclosed is a substantial indication that there was no intent, no knowledge, and no intent not to disclose the account. They understood that they did not have to. There's not a requirement for a specific intent. Is there, like, reckless disregard is enough. I think that... I mean, that's what Norman holds, isn't it? That is what Norman holds, and I believe that that, and I would like to... So there's no dispute she knew about this account. Absolutely no dispute she knew about this account. She knew about it almost after it was opened. I don't... Within a number of years. We don't need to quibble over the time. It doesn't matter when. She, at some point, absolutely became aware of this account before her father's death. Right, and she affirmatively signed tax returns, at least on one occasion, if not more, saying she had no foreign accounts. That is correct. And that was false. And that was false, and she also... Now, as to the account in Switzerland, she also did everything she could to conceal the account, as her father had instructed. Well, so I understand that that's the point, but even if that was all done in good faith, in pursuit of what they all consider an admiral goal, that's breaking the law. I mean, how is that a defense to underreporting taxes and not truthfully reporting things on her IRS forms? I'm not saying it's a defense to underreporting taxes. She absolutely had to pay the taxes and whatever interest and penalties there were. But what I'm saying is that when the legislature has specifically said willfully that they must have... I mean, it seems to me that this is almost a prime example of willfulness in that she knew about this account, and for personal reasons, not related to any legal misunderstanding, she willfully concealed it. If she only had the Swiss account, I think that we would be in a different position. But she also had the Paris account, and the Paris account, she didn't conceal in any way. She didn't disclose it on the account or the FBARs. But aside from that, her money went in from the United States to France. Her money was used in France. The statements were sent to her. However, it wasn't as the Swiss account where those statements were held. So in that circumstance, I think that there's a distinction of she clearly didn't know that she had to disclose the account because she knew that she definitely would have put down the account in Paris. And in fact, as soon as she found out that she had to disclose them- Again, we're back to reckless disregard, though, right? Because she had tax returns prepared for her that she signed, I think, under penalty of perjury, saying she had no foreign bank accounts. That is correct. And she said the reason she didn't disclose it was what? She didn't read them? Isn't that the definition of reckless disregard? Your Honor, if that were the case, then why in the world would we need the word willfully in this statute? And why would there be a distinction between the $10,000 not disclosing and the willfully not disclosing? I think that if that were the case, well, either you knew about the requirement and you didn't disclose it, or you recklessly failed to learn about the requirement, or you didn't know about the requirement because you didn't read your tax return. All of those are willful. What is the purpose of the word willfully? And what is the purpose of there being a $10,000 penalty? I think two and two. Well, we know from the Norman case now that willfulness includes reckless disregard. I do. And the court gave one example of where it might not be willful. And that was where you didn't know and didn't have any reason to know. But if that were the case, then you would say if you knowingly failed. And I think that this court has substituted the word knowingly for the word willfully because unless the F bar falls out on the way to the mailbox, there is no way that any failure to disclose an account could be anything but willful. So I think that the court has eviscerated that. It's hard to argue that signing a tax return with an answer that says, I have no foreign accounts when that's not the case, is not willful under any definition. If you look at the IRS manual, and I understand that it is not binding on the court. But I think it is something that the court can look at. The IRS manual specifically states that's not enough. And there ought to be more. And they gave examples of what could be more. So the IRS has said, just failing to file the F bar, just failing to check the box, that doesn't make it willful. But I think that the courts have found that that does make it willful. And I think that eviscerates the statute. Because that's knowingly. That standard is knowingly. There has to be something more when you're talking about willfully. And even if you find that it was willful, I think that the kind of knee-jerk imposition of the 50% penalty, which is the same penalty that would be assessed against somebody who was a money launderer, and put that money in a Swiss bank account for the specific purpose of hiding the money itself and any income from the money, that's the same as Mrs. Norman, who, excuse me, Mrs. Kimball, in the USB account, she didn't put any money into it. It was all her father's money. The only thing that was done with that money was that it was rolled over. It was kept in that account. And it wasn't touched. And the other account, the Paris account, she was in Europe. She was traveling extensively throughout Europe. She never touched that Swiss account. Money was put in from her accounts here, taxed money, to be used in the Paris account. So I think that the question of whether you could then find that to be willful, even if you could find that to be willful, there ought to be some differentiation between a situation like this one and a situation in which the money is hidden, the money is criminally derived, the purpose of the money is criminal, and the purpose of the deposits is to conceal this money from the taxing authorities. And this one, which I don't think there's any dispute that Mrs. Kimball wasn't, whether she should have been aware or not, that she wasn't in fact aware and that her husband, who is a bond trader, and who was the one that filled out a lot of these accounts and knew about this Swiss account, he also was not aware of the requirement because when he filled out the tax returns, he checked no. And he had an account that he had opened and established and put money into. I'm not saying that Mr. Kimball should be penalized because I think the statute had run by that time. But I think that there is very substantial evidence in this case that even if this is willful, it certainly was not intentional. It certainly was not done for the purpose of depriving the taxing authorities of their money. There was no indication. And if you look at the Norman case, when they talked about whether Mrs. Norman's conduct was willful, I appreciate what they said in the case, but then again, they went on to discuss the fact that Mrs. Norman, and we disagree with the facts, but the fact that they found was that Mrs. Norman had moved her money from one Swiss account to another when she learned that she had to disclose it and that she hadn't been entirely honest with the IRS. There is not that kind of facts in this case. It's a different factual issue because Mrs. Kimball never touched the money. And as soon as she learned, and not from... Mrs. Norman had learned it from the banker who came with the forms and said, now you've got to fill these out. She saw it in the New York Times. And as soon as she saw it in the New York Times, she voluntarily stepped forward. She disclosed all of the accounts. She cooperated with the IRS. There was nothing dishonest. And the facts on which the 50% penalty are based, I think are very clearly erroneous. There was a finding that Mrs. Norman opened this account, that she was the catalyst for this account, that she had put her mother on the account. None of that is correct. And also the finding that Mrs. Kimball had no relationship to either of the places in which the foreign accounts were kept. In fact, Mrs. Kimball had... The Paris account was open for a Paris apartment. That certainly was a relationship to France. As far as the Swiss account, she did not have any other connection with Switzerland, but she didn't open the Swiss account. She inherited an account that was in Switzerland. She inherited it with a list of strictures. And she kept to the strictures. She didn't move the money or do anything that her father told her not to do. But I think it's inaccurate to say that she didn't have any relationship with Switzerland as if that informed why she was hiding the money in Switzerland. She wasn't hiding the money in Switzerland. She had inherited the account, and she had left it in the way that her father had told her to leave it. And in our practice, and we do a number of these FBAR cases, a substantial number of the people who come into our practice are Holocaust survivors who have opened these foreign accounts after the war, opened these accounts in Switzerland and kept them secret because they were afraid of another Holocaust and they weren't really trusting of the government. So this is not an unusual situation. And I think if you're looking at whether just you have a foreign account, it's willful because you didn't disclose it, take 50%. I don't think that that's the reason that the penalty was set up to 50% and not 50%. And I don't think that that's a reason that there's a distinction between a willful and a non-willful violation. I think that this has taken on a life that the legislature didn't intend. And I'd like to reserve the rest of my time. Thank you, Ms. Frohn. Mr. Klimas. May it please the Court, Jeff Klimas for the United States. The Court of Federal Claims correctly granted the government's motion for summary judgment and sustained the FBAR penalty assessed against Ms. Kimball. First, the undisputed facts showed that Ms. Kimball's failure to report her Swiss bank account at UBS was, at a minimum, attributable to recklessness and willful blindness, where she walled herself off from actual knowledge of the reporting requirements by repeatedly failing to review the tax returns that she signed, which falsely represented that she had no foreign accounts, by failing to review the FBAR filing requirements to which those tax returns directed her. And does the government look at the reasons behind the failure to report in determining the extent of the penalty? I mean, in this case, it was the full 50% penalty. Yes, Your Honor. Do the facts warrant any sort of reduction? The IRS ultimately exercised its discretion and determined that a reduction was not warranted on these facts. Did the government consider the facts of the case, or was that just a matter of routine? Maximum penalty, end of case. No, Your Honor. The IRS did, in fact, conduct reasoned decision-making here, which is the touchstone of review for arbitrating capricious, in looking at the specific facts and circumstances of this case. There were several factors that it felt justified the imposition of a substantial and ultimately the maximum penalty, and it also considered Ms. Kimball's stated reason for not disclosing the account. The IRS focused, for example, on the fact that this was an account with a substantial balance. It was not a nominal amount. This is an account that grew to approximately $1.3 million. It considered that at Appendix 467. It furthermore considered the fact that Ms. Kimball, not only repeatedly and over a course of many years, failed to report the account itself, but also failed to report the income that was earned on the account and failed to pay taxes on that likely substantial income. But there's nothing here that would suggest, for example, an effort to conceal the fruits of a criminal enterprise or anything of that sort. No, Your Honor. There is certainly evidence of affirmative concealment, that Ms. Kimball took acts of affirmative concealment, and the IRS also considered that, but the IRS did not contend that this was ill-gotten,  However, we would suggest that because of the length of time, there's no analogous case that Ms. Kimball has pointed to or that we've located where someone actually concealed the account and the earnings from that account for three decades, that there is substantial harm, substantial tax loss that cannot be quantified precisely because of Ms. Kimball's failure to report the account and failure to report the income on that account. And that factor, the IRS found to be substantial and significant in imposing a 50% penalty, that Ms. Kimball evaded taxes on a substantial sum of money for a period of three decades. It certainly, it looks as if she hadn't come forward voluntarily, it would not have been discovered and could not have been discovered. And isn't there some sort of different, I'm thinking about the cruel and unusual system of punishment that governs everything that we do, and particularly, maybe not particularly, but includes government actions. She came forward voluntarily, put herself into a system to learn what had gone wrong, made known that which would not have been known, could not have been known, at least as far as the Swiss account was concerned, and nonetheless is hit with the same penalty as if she were a drug dealer, money launderer, or whatever else. So, Your Honor, let me start by addressing whether the IRS might have discovered this. Ms. Kimball came forward specifically when it became publicly known that the Department of Justice was applying pressure to UBS, where she held her account, to turn over the names of its secret account holders. Ms. Kimball's account likely would have been discovered in short order. Certainly, she came forward and availed herself of a publicly announced settlement initiative, the 2009 Offshore Voluntary Disclosure Program. That program, by its terms, offered a reduced penalty structure to taxpayers who were accepted into the program. It was a two-size-fits-all program. The default penalty under that program was not the maximum 50%, it was 20%. There were a certain narrow class of taxpayers who would qualify for a reduced penalty structure of 5% instead of 20% under that program. Ms. Kimball did not qualify for that reduced 5% structure and should have known that when she applied because these terms were publicly available. The particular provision that she did not qualify for is there has been no activity in any account or entity, no deposits, withdrawals, et cetera, during the period the account or entity was controlled by the taxpayer. No activity in any account or entity. And the problem is with respect to both of Ms. Kimball's foreign accounts, both the HSBC account in France and the UBS account in Switzerland, that there was activity. With respect to the HSBC account, she admits that she was depositing and withdrawing money from it. With respect to the UBS account, at the time that she was in control of it, she was rolling over matured bonds and interest into different investments. She was changing the currency in which the account was denominated. So she didn't qualify for the 5% structure, but the IRS said, we will give you the 20% structure. Ms. Kimball, for whatever reason, decided that she did not want to take the 20% deal. She was advised in writing by the IRS, if you do not accept this offer in the settlement initiative, your penalty liability will no longer be determined by the artificial constraints of the settlement initiative. Rather, it will be dependent on our review of your case in accordance with the law. Your penalty liability could go up, it could go down. That was a chance that she decided to take. In fact, with respect to the HSBC account, which had a much smaller balance, roughly $140,000 versus $1.3 million, and was open for a substantially lower amount of time, 10 years versus roughly three decades, that account, the penalty was reduced from 20% under the program to 10%. With respect to the larger UBS account, for which there was active concealment, a much longer period of non-disclosure, a much longer period of non-payment of taxes, a much more substantial balance, ultimately, the penalty went up. Again, we think that's something that Ms. Kimball should have anticipated, certainly that her lawyer should have advised her at the time that she was in the program. The Internal Revenue Manual, which is publicly available on the IRS's website, it's publicly available at Lexis, Westlaw, specifically provides that the baseline penalty for an account exceeding $1 million is 50%. Certainly, there are mitigation guidelines and there's the potential for that penalty to be reduced, but Ms. Kimball knew at the time that she withdrew from the program, was advised in writing that the penalty might increase, and the information that the IRS has released publicly in the Internal Revenue Manual suggested that that was a real possibility. We don't, we certainly don't point to Ms. Kimball as someone who had any kind of nefarious motives, but the harm to the government in this instance because of the long period of non-disclosure and the long period of taxes, again, three decades of non-payment of taxes on a substantial amount. There's no dispute, is there, that she came forward voluntarily? That's correct, Your Honor, she came forward voluntarily. Ultimately, though, the government decided that the substantial harm to public revenue and tax administration from the long period of non-disclosure was a factor that was accorded significant weight in determining the appropriate penalty amount. We would submit that that was a choice that the IRS was entitled to make and that the IRS's discretion is at its highest, that it should be afforded the most deference when what it's doing is balancing and weighing competing interests and considerations. That's what it did here in giving substantial weight to the amount of the account, her active management of the account, her active concealment of the account, the length of time and the pattern and course of conduct during which she avoided paying taxes and avoided disclosing the account. We think that that decision is entitled to deference. So the standard for determining the amount of the penalty is the harm to the government? That's certainly one of the factors that the government considers is whether the penalty amount would be commensurate with the harm to the government. Is there, but I didn't hear you say anything about assessing the penalty based upon the motives of the party involved. So in this case, the IRS... It seems to me you're treating criminals and nefarious types the same as people who have otherwise innocent motives. So the IRS did consider Ms. Kimball's motivations. This is at 462 of the record. It acknowledged that Ms. Kimball's father's stated reason for opening this account was a fear of religious persecution. However, it noted that that does not excuse compliance with US law and... Court side. Sure. It also noted that at no point had Ms. Kimball stated that that was the reason why she maintained this as a secret account. That she never stated that she shared that fear. That she was acting to honor her father's wishes not because of a shared fear. And I think that's consistent with the position that she's taken out of heel in pages 10 and 11 of her opening brief saying that she wanted to respect her father's wishes not that she shared this specific fear. And in any event, if we were to excuse non-compliance with the law, with US law based on a stated fear of the US government, that would be a substantial problem in terms of enforcing reporting requirements. We would note that the IRS mitigation guidelines do provide that there will be no mitigation and no reduction of the FR penalty from the baseline numbers. If the taxpayer has a history of criminal tax convictions, a history of convictions under the Bank Secrecy Act, a history of being assessed FR penalties in the past. This is at appendix 512.  just because they're not a criminal. The IRS does not give any break to the criminals, but it doesn't give someone a break just because they're not committing additional crimes, additional violations of law in addition to the failure to report the taxes and pay those taxes and the failure to file the accurate FRs. Turning to the, I'm sorry. Turning to the 8th Amendment challenge, we would note that as a threshold matter, the Court of Federal Claims held that this claim was not presented on the face of the complaint and we think consistent with this court's decision in Casa de Cambrio, was entitled to find that that theory had been waived where she did not make any constitutional challenge and raised only a statutory challenge. But even if we turn to the merits, we would note that the FR penalty is neither refined nor excessive, a finding of either of which is sufficient on its own to defeat the claim on the merits. With respect to whether or not it's a fine, we would suggest that there's three distinctions with respect to the FR penalty that make it more like the remedial tax penalties that were at issue in California v. Mitchell or the customs penalties that were at issue in one lot Emerald Cut Stones, then like the punitive forfeiture measures that were held to be excessive fines or potentially excessive fines by the Supreme Court in Vajikajian, Austin and Thames. First of all, the fact is that Congress explicitly distinguished between civil and criminal penalties here, which is different than any of the criminal forfeiture or interim forfeiture cases in which the Supreme Court addressed this issue. That the civil penalty is not dependent on the imposition of a criminal conviction. And those two can be the criminal and the civil penalties can be both enforced or one or the other can be enforced and not dependent on each other. And in 5321D, they're explicitly allowed to stack on top of one another. Secondly, the legislative history surrounding the Bank Secrecy Act and the FR provisions in particular reflect a congressional focus on remediation on the fact that there is substantial tax loss and cost of investigation. And then finally, unlike the cases of Vajikajian in Austin, the FR penalties are not a one size fits all penalty, which is the Supreme Court's concern in those cases is that they are imposed as a matter of course, as a matter of statute, without regard to the nature of the underlying violation and without regard to the harm that's caused by the violation. Here, Congress has given the IRS discretion to adjust the penalty to make it commensurate with the nature of the underlying offense and with the harm caused to the government, which is in practice the way that the IRS also applies the imposition of those penalties. Turning to the excessiveness inquiry, we would note that as the DC Circuit observed in Collins, that once a court finds that a penalty is not arbitrary and capricious, that it was within the agency's discretion to impose, it's not a great leap to then find that it's not constitutionally excessive, that it is a related inquiry. And here, we would note that the IRS, again, engaged in reasoned decision-making in looking at the amount that was held in the account, the length of time it went undisclosed, the pattern of conduct, the pattern of the violations, which is consistent with the way that courts have also looked at the excessiveness inquiry in terms of the constitutional issue. The Seventh Circuit in Malawika, the Eleventh Circuit in Speraza, the District Court in Garrity II, all looked at the fact that this was part of a continuing course of conduct, which counseled against a finding of excessiveness on the facts here. We'd also note that Ms. Kimball falls squarely within the class of persons for whom the FR penalty is intended because she is someone who escaped taxation on the earnings of this account, the substantial earnings in this account, for a number of years. And because the length of time for which those taxes went unpaid was so long, we think that this is in some ways analogous to a situation in which both the principal and interest in the account went untaxed. Because this isn't a situation where it was five for 10 years, this is three decades. And therefore, the funds that escaped taxation, the income that escaped taxation is substantial, particularly when taking into account the interest that would have accrued representing the time value of money. Unless there are any further questions, we would ask that the lower course decision be affirmed. Okay, thank you, Mr. Clements. Ms. Frown? I think that the issue of excessiveness of the 50% penalty is a very important issue in this case. Did you plead the Eighth Amendment claim in your complaint? We didn't, not specifically, but we pleaded that the fine was excessive. And the Eighth Amendment penalty, the Eighth Amendment claim was that it was excessive. How does that preserve it? I mean, that sounds like it's a statutory argument in the complaint. A constitutional argument is completely separate. At least in the cases that I've seen, if you claim that there, if you make a claim of excessiveness, and I don't think that that's a statutory argument. I think that that's an argument as to- The argument in the other part of this case is that 50% is excessive, and that it shouldn't have been awarded at 50%, it should have been reduced. Yes, but that was- That was the government put on notice that there was a constitutional violation here when you didn't cite the Eighth Amendment. The government was certainly on notice by the time of the motion for summary judgment, because it was a substantial factor in our motion for summary judgment. I don't know that you have to- You have to put it in your complaint. I don't know that you have to- Did you ask to file an amended complaint at any point? We did not. But I still think that this court can reach the constitutional issue. And in terms of, and there's also just the question of whether under the facts of this case, the 50% was excessive, which is a completely different one. And when we look at what the IRS reviewed, the IRS didn't rely on 30 years of her not paying taxes, of which a good deal of the 30 years was not her not paying taxes, it was her father and her mother not paying taxes. They relied upon erroneous factual findings. They relied upon the finding that she controlled the account, she put her mother on the account. They relied upon the finding that she had no relationship to either of the countries in which these accounts were held. If you looked at the entire facts, and I'm not saying that she would be excused from a penalty because she followed her father's instructions as to the account. I'm saying that when you look at the entirety of this case, that it is not equitable and it is not reasonable and it is an abuse of discretion to basically impose that 50% penalty on everyone regardless of whether they deposited money that was illegally earned, regardless of whether they deposited the money with the intention of evading taxes, regardless of all of the other factors that the IRS says to take into account in looking at this. I don't think it's fair to say that Mrs. Kimball, for example, ran into the IRS because she knew that the IRS was gonna come after her. She looked at the article and according to her, and there's nothing to say that it was wrong, she learned that she had erroneously not been reporting her foreign accounts and she immediately went in and reported her foreign accounts. So I think that, again, if you look at the entirety of the circumstances in this case, even if you find that this is willful, that there was not a justification for applying the maximum possible penalty and that a lower penalty should have been applied. Are you aware of any other cases in which a lesser penalty was imposed by the government? There are. I'm not talking about the initial OVDP program, but just in the normal course. Yes, there are cases in which lower penalties were imposed. In fact, there's one of them that the willfulness issue is being litigated in, but it was a 25% penalty for some reason. But for the most part, I haven't seen this particular issue come before this particular issue of whether the 50% penalty should be imposed in every case across the board. I have not seen this issue come before the board. So the government does take into account factors that might warrant the mitigated penalty? I don't know if the government does or does not. I know that nobody's challenging that issue. But you just said that there are cases. There was one case in which, I don't know why there was a 25% penalty. There are cases that I cite in which on facts that are significantly more egregious than this case, the actions were found to be non-wilful. So the $10,000 penalty was imposed. But I don't know that this particular question of whether the 50% penalty can or cannot be imposed across the board was ever presented to any court before this one. Thank you. Thank you both. The case is taken under submission. Thank you.